BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK STEVEN ZWICK, Derivatively on Behalf of Nominal Defendant LIVE NATION ENTERTAINMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL RAPINO, GREGORY B. MAFFEI, MAVERICK CARTER, PING FU, JEFFREY T. HINSON, CHAD HOLLINGSWORTH, JIMMY IOVINE, JAMES S. KAHAN, RANDALL T. MAYS, LATRIECE WATKINS, RICH PAUL, and DANA WALDEN, <br><br> Defendants, <br><br> and <br><br> LIVE NATION ENTERTAINMENT, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Mark Steven Zwick ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Live Nation Entertainment, Inc. ("Live Nation" or the "Company"), against its current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Live Nation, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Donley v. Live Nation Entertainment, Inc., et al.,* Case No. 2:23-cv-06343 (C.D. Cal. Aug. 4, 2023) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Live Nation against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least February 23, 2022 and July 28, 2023, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.     Live Nation is a global entertainment company operating in 48 countries. The Company owns and operates music venues, manages artists, and, through its subsidiary Ticketmaster, promotes and manages ticket sales for live entertainment.

3.     Live Nation merged with Ticketmaster in January 2010 pursuant to a consent decree with the U.S. Department of Justice ("DOJ") to preserve competition in the live events market. In 2019, the DOJ moved to enforce the consent decree

and alleged that the Company had been engaging in anticompetitive conduct in violation thereof, including pressuring concert venues to use Ticketmaster instead of other ticketing platforms. To resolve these claims, the Company agreed to added provisions in the consent decree and agreed to extend the consent decree to expire in December 2025. Pursuant to the amended consent decree, Live Nation agreed to, *inter alia*, refrain from conditioning the provision of Live Nation concerts on a venue utilizing Ticketmaster's platform or from retaliating against a venue for choosing an alternative ticketing platform. The Company is subject to an automatic $1 million fine for each violation.

4.     On November 18, 2022, *The New York Times* reported that the DOJ had begun investigating Ticketmaster and Live Nation after the Company's ticketing platform crashed during a highly-anticipated presale for Taylor Swift tickets. Fans' inability to procure tickets due to the crash highlighted Live Nation's exorbitant market power in the live entertainment industry.

5.     On this news, the price of Live Nation's stock declined 7.8% in one day, to close at $66.21 on November 18, 2022.

6.     On February 23, 2023, *NPR* reported that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights called on the DOJ to continue its investigation into the Company and presented evidence that "Live Nation is harming America's music industry."

7.     On this news, the price of Live Nation's stock declined 10.1% in one day, closing at $68.78 on February 24, 2023.

8.     On July 28, 2023, *Politico* reported that the DOJ "could file an antitrust lawsuit against [the Company] by the end of the year according to three people with knowledge of the matter." According to the *Politico* report, the DOJ action was expected to allege that "the entertainment giant is abusing its power over the live music industry."

9.     On this news, the price of Live Nation's stock declined 7.8%, closing

1    at $89.33 on July 28, 2023.

2        10.    Throughout the Relevant Period, the Individual Defendants issued

3    statements that were materially false and misleading and omitted to state material

4    adverse facts necessary to make the statements not misleading because they failed

5    to disclose that: (i) Live Nation engaged in anticompetitive conduct including

6    entering into extended restrictive contracts with artists and venues, charging high

7    fees for its ticketing services, and retaliating against venues for working with

8    alternative promoters or ticketing services; (ii) as a result, Live Nation was

9    reasonably likely to face regulatory scrutiny, fines, penalties, and reputational harm;

10   and (iii) as a result of the foregoing, the Individual Defendants' positive statements

11   regarding the Company's business, operations, and prospects lacked a reasonable

12   basis.

13       11.    As a result of the foregoing, the Securities Class Action was filed

14   against the Company, its Chief Executive Officer ("CEO") and its Chief Financial

15   Officer ("CFO") exposing the Company to massive class-wide liability.

16                    **JURISDICTION AND VENUE**

17       12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

18   because Plaintiff's claims raise a federal question under Section 10(b) of the

19   Securities Exchange Act of 1934 (the "Securities Exchange Act") (15 U.S.C. §§

20   78(j)).

21       13.    Plaintiff's claims also raise a federal question pertaining to the claims

22   made in the Securities Class Action based on violations of the Securities Act.

23       14.    This Court has supplemental jurisdiction over Plaintiff's state law

24   claims pursuant to 28 U.S.C. § 1367(a).

25       15.    In connection with the acts, conduct and other wrongs complained of

26   herein, the Individual Defendants, directly or indirectly, used the means and

27   instrumentalities of interstate commerce, the United States mail, and the facilities

28   of a national securities market.

16.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Live Nation maintains its headquarters in this District, and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

## PARTIES

### *Plaintiff*

17.     Plaintiff is, and has been at all relevant times, a shareholder of Live Nation.

### *Nominal Defendant*

18.     Nominal Defendant Live Nation is incorporated under the laws of Delaware with its principal executive offices located at 9348 Civic Center Drive, Beverly Hills CA 90210.  Live Nation's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbols "LYV."

### *The Individual Defendants*

19.     Defendant Michael Rapino ("Rapino") has served as President, CEO, and as a member of the Board since 2005. According to the Company's public filings, Defendant Rapino received a staggering $139,005,565 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Rapino beneficially owned 4,092,044 shares of common stock, worth $287,179,647.[1]

20.     Defendant Gregory B. Maffei ("Maffei") has served as a member of the Board since 2011 and has served as Chairman of the Board since 2013. According to the Company's public filings, Defendant Maffei received $352,891 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Maffei beneficially owned 102,939 shares of common stock, worth $7,224,259.

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $70.18 per share closing price of Live Nation's stock on April 11, 2023.

21.     Defendant Maverick Carter ("Carter") has served as a member of the Board since 2018 and serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Carter received $233,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Carter beneficially owned 13,454 shares of common stock, worth $944,201.

22.     Defendant Ping Fu ("Fu") has served as a member of the Board since 2018 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Fu received $245,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Fu beneficially owned 15,770 shares of common stock, worth $1,106,738.

23.     Defendant Jeffrey T. Hinson ("Hinson") has served as a member of the Board since 2005 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Hinson received $263,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Hinson beneficially owned 59,731 shares of common stock, worth $4,191,921.

24.     Defendant Chad Hollingsworth ("Hollingsworth") has served as a member of the Board since 2020 and serves as Chair of the Compensation Committee. According to the Company's public filings, Defendant Hollingsworth received $254,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Hollingsworth beneficially owned 7,822 shares of common stock, worth $548,947.

25.     Defendant Jimmy Iovine ("Iovine") has served as a member of the Board since 2014 and serves as a member of the Compensation Committee. According to the Company's public filings, Defendant Iovine received $239,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Iovine beneficially owned 46,532 shares of common stock, worth $3,265,615.

26.     James S. Kahan ("Kahan") has served as a member of the Board since

2007 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Kahan received $245,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Kahan beneficially owned 100,464 shares of common stock, worth $7,050,563.

27.    Defendant Randall T. Mays ("Mays") has served as a member of the Board since 2005 and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the Company's public filings, Defendant Mays received $242,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Mays beneficially owned 133,620 shares of common stock, worth $9,377,451.

28.    Defendant Latriece Watkins ("Watkins") has served as a member of the Board since 2021 and serves as a member of the Compensation Committee. According to the Company's public filings, Defendant Watkins received $224,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Watkins beneficially owned 2,841 shares of common stock, worth $199,381.

29.    Defendant Rich Paul ("Paul") has served as a member of the Board since April 2023.

30.    Defendant Dana Walden ("Walden") served as a member of the Board from June 2017 until June 2023. According to the Company's public filings, Defendant Walden received $239,103 in 2022 in compensation from the Company. As of April 11, 2023, Defendant Walden beneficially owned 13,539 shares of common stock, worth $950,167.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.    By reason of their positions as officers and/or directors of Live Nation, and because of their ability to control the business and corporate affairs of Live Nation, the Individual Defendants owed Live Nation and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Live Nation in a fair, just, honest,

and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Live Nation and its shareholders so as to benefit all shareholders equally.

32.    Each director and officer of the Company owes to Live Nation and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Live Nation, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.    To discharge their duties, the officers and directors of Live Nation were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.    Each Live Nation Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Live Nation, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial

statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.    To discharge their duties, the officers and directors of Live Nation were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Live Nation were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Live Nation's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Live Nation conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Live Nation and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Live Nation's operations would comply with all applicable laws and Live Nation's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

38.      Each of the Individual Defendants further owed to Live Nation and the shareholders the duty of loyalty requiring that each favor Live Nation's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Live Nation and were at all times acting within the course and scope of such agency.

40.      Because of their advisory, executive, managerial, and directorial positions with Live Nation, each of the Individual Defendants had access to adverse, non-public information about the Company.

41.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public

statements issued by Live Nation.

## LIVE NATION'S CODE OF BUSINESS CONDUCT AND ETHICS

42.     Live Nation's Code of Business Conduct and Ethics (the "Code of Conduct") begins with a message from Defendant Rapino, which states:

**To all employees**
Our company is founded on our commitment to the highest ethical principles and standards. We value honesty and integrity above all else. Upholding these commitments in all of the countries in which we operate is essential to our continued success.

The law and the ethical principles and standards that comprise this code of conduct must guide our actions. The code is, of course, broadly stated. Its guidelines are not intended to be a complete listing of detailed instructions for every conceivable situation. Instead, it is intended to help you develop a working knowledge of the laws and regulations that affect your job.

Adhering to this code is essential. I have personally taken the time to study it carefully and I encourage you to do the same.

Ultimately, our most valuable asset is our reputation. Complying with the principles and standards contained in this code is the starting point for protecting and enhancing that reputation. Thank you for your commitment!

43.     The Code of Conduct explicitly applies to "all company employees, workers, officers and  members of the Board of Directors," and violations of the Code of Conduct "or failure to report such violations . . . will result in disciplinary action, up to and including the termination of your employment."

44.     In a section titled "**FAIR DEALING**," the Code of Conduct states:

We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must

conduct business honestly and fairly and not take unfair advantage of anyone though any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud or other unfair business practice.

45.    In a section titled "**COMPLIANCE WITH LAWS**," the Code of Conduct states:

First and foremost, our policy is to behave in an ethical manner and comply with all laws, rules and government regulations that apply to our business regardless of location. Although we address several important legal topics in this code, we cannot anticipate every possible situation or cover every topic in detail. It is your responsibility to know and follow the law and conduct yourself in an ethical manner.

*       *       *

**Antitrust Laws**
Antitrust laws are designed to ensure a fair and competitive marketplace by prohibiting various types of anti-competitive behavior.

*       *       *

Most competition law issues surrounding your relationships with clients or suppliers involve ensuring that the Company is not foreclosing the opportunity of rivals to compete in the market, either by locking up customers or depriving them of needed supplies. It is perfectly appropriate for you to compete hard for customers and to win their business on the merits. Certain arrangements, however, can raise competition law issues depending on the circumstances. These include, but may not be limited to exclusive dealing arrangements, predatory pricing, and bundling.

In addition, conditioning or withholding of content based on the use or non-use of Live Nation Entertainment ticketing providers is not permitted.

46.    In a section titled "**ACCURACY OF COMPANY RECORDS**," the Code of Conduct states:

Information derived from our records is provided to our shareholders and investors, as well as government agencies. Thus, our accounting records must conform not only to our internal control and disclosure

procedures but also to generally accepted accounting principles and other laws and regulations, such as those of the Internal Revenue Service or applicable taxing authority and the U.S. Securities and Exchange Commission. Our public communications and the reports we file with the U.S. Securities and Exchange Commission and other government agencies should contain information that is full, fair, accurate, timely and understandable in light of the circumstances surrounding disclosure.

## **LIVE NATION'S AUDIT COMMITTEE CHARTER**

47.     Pursuant to Live Nation's Audit Committee Charter, the purpose of the Audit Committee is to:

*1.*     *Assist Board oversight of:*

- the quality and integrity of the financial statements of the Company and the Company's accounting and financial reporting processes and systems of internal control,

- the Company's compliance with legal and regulatory requirements,

- the independent auditors' qualifications and independence, and

- the performance of the Company's internal audit function and independent auditors.

48.     In a section titled "*With Respect to Review of Internal Audits, Annual External Audit and Quarterly Reviews,*" the Audit Committee Charter states that the Audit Committee shall:

- Review with management and the director of internal audit the internal audit department's budget and staffing, results of the internal audit department's findings and proposed audit plans.

- Review and discuss the following items with management and

the independent auditors upon the completion of the annual audit and before issuance of the financial statements and the filing of the Form 10-K:

a.  The Company's annual financial statements and related notes and the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

b.  The results of the independent auditor's audit of the financial statements and the report thereon.

*     *     *

• Review with management and the independent auditors the financial statements, related notes and other financial disclosures included in other Company filings with the SEC containing the Company's financial statements before such filings are made.

49.  The Audit Committee Charter further provides that the Audit Committee will:

• Regularly report Committee activities to the full Board with such recommendations as the Committee may deem appropriate, including any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the independent auditors or the performance of the internal audit function.

• Discuss guidelines and policies with respect to risk assessment and risk management including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including legal and ethical compliance programs.

*     *     *

• Review periodically with management and the Chief Legal Officer the status of legal and regulatory matters that may have a material impact on the Company's financial statements and compliance policies.

• Receive any report by legal counsel regarding any evidence of a

material violation of securities laws, breach of fiduciary duty or similar violation by the Company or its agents.

## **SUBSTANTIVE ALLEGATIONS**

*Background*

50. Live Nation is a global entertainment company operating in 48 countries. The Company owns and operates music venues, manages artists, and promotes and manages ticket sales for live entertainment through its subsidiary Ticketmaster.

51. Live Nation merged with Ticketmaster in January 2010 pursuant to a consent decree with the DOJ to preserve competition in the live events market. In 2019, the DOJ moved to enforce the consent decree and alleged that the Company had been engaging in anticompetitive conduct in violation thereof, including pressuring concert venues to use Ticketmaster instead of other ticketing platforms. To resolve these claims, the Company agreed to added provisions in the consent decree and agreed to extend the consent decree to expire in December 2025. Pursuant to the amended consent decree, Live Nation agreed to, *inter alia*, refrain from conditioning the provision of Live Nation concerts on a venue utilizing Ticketmaster's platform or from retaliating against a venue for choosing an alternative ticketing platform. The Company is subject to an automatic $1 million fine for each violation.

*Materially False and Misleading Statements*

52. The Relevant Period begins on February 23, 2022, when Live Nation filed its 2021 annual report on Form 10-K (the "2021 10-K"), signed by Defendants Rapino, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Walden, and Watkins. The 2021 10-K stated:

> ***In December 2019, we agreed with the United States Department of Justice to extend and clarify the court-imposed final judgment to which we became subject in connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC, which places***

***certain restrictions and obligations on us which could negatively impact our business.***

In connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC in 2010, we became subject, through July 2020, to a court-imposed final judgment (the "Final Judgment") that places certain restrictions and obligations on us in order to address the issues the United States Department of Justice (the "DOJ") raised in its antitrust review of the merger. Pursuant to the Final Judgment, we agreed to abide by certain behavioral remedies and to provide periodic reports to the DOJ about our compliance with the Final Judgment. The Final Judgment was due to expire in July 2020; in December 2019, we reached an agreement with the DOJ to clarify certain aspects of the Final Judgment and extend its duration through the end of 2025 (the "Amended Final Judgment").

***Under the Amended Final Judgment we may not (i) threaten to condition (or actually condition) the provision of Live Nation concerts on a venue choosing Ticketmaster, or (ii) retaliate (i.e., withhold any Live Nation concerts) in response to a venue choosing a ticketing services provider other than Ticketmaster.*** In addition, pursuant to the Amended Final Judgment, (i) an independent monitor has been appointed to monitor and report to the DOJ on our compliance with the Amended Final Judgment, and investigate any potential violations thereof, (ii) we appointed an internal antitrust compliance officer and have conducted (and will continue to annually conduct) internal trainings to ensure our employees fully comply with the Amended Final Judgment; (iii) we provided, and will continue to provide, notice to current or potential venue customers of the Amended Final Judgment and its restrictions on our business conduct; and (iv) we are subject to an automatic penalty of $1,000,000 for each violation. We agreed to pay costs and fees for the independent monitor and the DOJ's past investigation and enforcement.

During the duration of the Amended Final Judgment, we are restricted from engaging in certain business activities that, absent the Final Judgment, would be lawful for us to undertake. Our inability to undertake these business strategies could disadvantage us when we compete against firms that are not restricted by any such order. In addition, our business will be under continued and enhanced scrutiny

by the DOJ, including by the independent monitor. ***Our compliance with the Amended Final Judgment therefore creates certain unquantifiable business risks for us.***

(Initial emphasis in original).[2]

53.    On May 5, 2022, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "1Q2022 10-Q"). The 1Q2022 10-Q discussed class action lawsuits filed in Canada alleging that "Live Nation and/or Ticketmaster engage in conduct that is intended to encourage the resale of tickets on secondary ticket exchanges at elevated prices":

> Based on information presently known to management, we do not believe that a loss is probable of occurring at this time, and we believe that the potential liability, if any, will not have a material adverse effect on our financial position, cash flows or results of operations. ***Further, we do not currently believe that the claims asserted in these lawsuits have merit, and considerable uncertainty exists regarding any monetary damages that will be asserted against us. We continue to vigorously defend these actions.***

54.    In connection with the 1Q2022 10-Q, the Company issued a press release which stated:

> ***The industry continues to embrace market-based pricing, particularly on the best tickets, shifting $500 million to artists for shows this year, resulting from a double-digit increase in ticket pricing,*** and reducing the price arbitrage in the secondary market. At the same time, in the U.S., the average entry level price to get in and enjoy the show remains under $35, approachable for almost all fans.

55.    On August 4, 2022, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "2Q2022 10-Q"), which stated:

_____

[2] Unless indicated otherwise, all emphasis is added in this Complaint.

Our Ticketing segment revenue for the quarter grew by $331 million, from $244 million in the second quarter of 2021 to $575 million in the second quarter of 2022. Ticketing AOI for the quarter increased by $131 million, from $99 million in 2021 to $231 million in 2022. The improvement resulted from an increase in ticket sales, upward pricing momentum due to higher fan demand, and higher ancillary revenue streams. Our fee-bearing ticket sales for the quarter were 72 million, 46 million higher than in the second quarter of last year. This was a record quarter for reported ticket sales, exceeding our last record set in the fourth quarter of 2018 by 9 million tickets or 15%. The increase was largely driven by sales in the United States, the United Kingdom, our mainland European markets, and the addition of OCESA. Our resale business continued to excel, with nearly a billion dollars in GTV for the second quarter of 2022, more than doubling resale GTV in the second quarter of 2019. It was our second highest resale quarter ever, powered by both Concerts and all the major sporting leagues. For the first six months of 2022, our Ticketing revenue grew by $783 million, from $272 million in 2021 to $1.1 billion in 2022. Ticketing AOI for the first six month increased by $400 million, from $37 million in 2021 to $437 million in 2022. Through the end of June, our fee-bearing ticket sales are 124 million tickets, 91 million ahead of 2021 and, notably, 20 million ahead of 2019 when all markets were fully open. Resale GTV through the end of June 2022 was over $1.8 billion which is 90% of our full-year resale GTV in 2019. Overall pricing on our fee- bearing tickets for the first half of the year is up more than 15% compared to 2019. Consumer demand for premium seats and VIP experiences has continued, with our Ticketmaster dynamic price sales and GTV growing by 2.5 times the volume in 2019. Lastly, we have signed 13 million net new tickets so far this year, which gives us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward.

*        *        *

Ticketing revenue increased $331.3 million during the three months ended June 30, 2022 as compared to the same period of the prior year primarily due to an increase in North America primary and secondary ticket fees driven by more events on sale and upward pricing momentum due to higher fan demand in 2022 as compared to the resumption of concerts and sporting events starting late in the second quarter of 2021. Ticketing had incremental revenue of $26.1 million

during three months ended June 30, 2022 due to acquisitions.

56.     On October 26, 2022, under pressure from President Biden to promote ticketing fee transparency, the Company issued a press release, stating:

> We applaud President Biden's advocacy for fee transparency in every industry, including live event ticketing. Live Nation Entertainment advocated for the all-in pricing mandate passed in New York earlier this year, which requires face-value prices and fees to be shown upfront – and we support the FTC mandating this nationally. We operate ticketing marketplaces in 30+ countries around the world and have seen all-in pricing adopted successfully in many countries when mandated across the board. This only works if all ticketing marketplaces go all-in together, so that consumers truly have accurate comparisons as they shop for tickets.

57.     On November 3, 2022, the Company issued a press release to announce its financial results for the quarter ended September 30, 2022, which stated:

> As we have grown attendance, we have also continued driving greater market pricing for our concerts, and now expect to transfer over $550 million of additional payments to artists this year, continuing our efforts to help artists get the full value from their shows.
>
> *       *       *
>
> Finally on Ticketmaster, a point on some recent press regarding ticketing fees. We will continue to advocate for fee transparency in live event ticketing. We advocated for the all-in pricing mandate passed in New York earlier this year, which requires face-value prices and fees to be shown upfront – and we support the FTC mandating this nationally. We operate ticketing marketplaces in more than 30 countries around the world and have seen all-in pricing adopted successfully in many countries when mandated across the board. This only works if all ticketing marketplaces adopt together, so that consumers truly can accurately compare as they shop for tickets.

58.     The statements identified in ¶¶ 52-57 were materially false and

misleading and failed to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Live Nation engaged in anticompetitive conduct including entering into extended restrictive contracts with artists and venues, charging high fees for its ticketing services, and retaliating against venues for working with alternative promotors or ticketing services; (ii) as a result, Live Nation was reasonably likely to face regulatory scrutiny, fines, penalties, and reputational harm; and (iii) as a result of the foregoing, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects lacked a reasonable basis.

***The Truth Emerges***

59.     The truth began to emerge on November 18, 2022, when *The New York Times* reported that the DOJ had was investigating Live Nation and Ticketmaster after the Company's ticketing platform crashed during a highly anticipated presale for Taylor Swift tickets. Live Nation's mishandling of the Taylor Swift tour highlighted the Company's market power in the live entertainment industry. The article stated that the DOJ had "in recent months contacted music venues and players in the ticket market, asking about Live Nation's practices and the wider dynamics of the industry," and that the "inquiry appears to be broad, looking at whether the company maintains a monopoly over the industry, one of the people said." The article further detailed the Taylor Swift "ticketing debacle":

> The problems began Tuesday when Ticketmaster's Verified Fan system, which aims to weed out bots and professional scalpers from the process, began doling out access codes to fans who were interested in buying tickets to Ms. Swift's Eras tour, scheduled to start in March.
>
> According to a blog post by Ticketmaster, which was published on Thursday but deleted within hours, 3.5 million fans registered for the program. The company "invited" 1.5 million of those customers to the presale by sending them codes, and the remaining two million were placed on a waiting list.

That day, Ticketmaster received 3.5 billion system requests, causing its app to crash for many users; some who were in the process of buying tickets with their codes were unable to complete their transactions. According to Ticketmaster, two million tickets were sold on Tuesday alone. Another presale, for Capital One cardholders, was held on Wednesday.

But Thursday afternoon, Ticketmaster canceled its plans for a public ticket sale on Friday, when it would typically sell any tickets remaining after presales. It was unclear how many tickets had already been sold for Ms. Swift's tour, and how many — if any — remained.

On Friday, in her first comments about the ticketing debacle, Ms. Swift posted a statement to social media saying she was looking into the situation to see how it could be improved. But she also expressed disappointment in Ticketmaster.

"I'm not going to make excuses for anyone," Ms. Swift wrote, "because we asked them, multiple times, if they could handle this kind of demand, and we were assured that they could."

60.    On this news, the price of Live Nation's stock declined 7.8% to close at $66.21 per share on November 18, 2022.

61.    The price of the Company's stock remained inflated, however, as the Individual Defendants continued to issue false and misleading statements regarding the DOJ investigation and the Company's anticompetitive conduct. For instance, on November 19, 2022 the Company issued a statement regarding the investigation:

**A Statement From Live Nation Entertainment**

***As we have stated many times in the past, Live Nation takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation, let alone orders that would require it to alter fundamental business practices.***

The concert promotion business is highly competitive, with artist management in control of selecting their promoting team. The demand for live entertainment continues to grow, and there are more promoters

-21-

than ever working with artists to help them connect with fans through live shows. The Department of Justice itself recognized the competitive nature of the concert promotion business at the time of the Live Nation-Ticketmaster merger. That dynamic has not changed.

Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system. The market is increasingly competitive nonetheless, with rivals making aggressive offers to venues. That Ticketmaster continues to be the leader in such an environment is a testament to the platform and those who operate it, not to any anticompetitive business practices. 5 years ago tickets were paper, now you scan in with your phone, and can transfer tickets to your friend with one tap. We innovate and invest in our technology more than any other ticketing company, and we will continue to do so.

Secondary ticketing is extremely competitive, with Ticketmaster competing with StubHub, SeatGeek, Vivid and many others. ***No serious argument can be made that Ticketmaster has the kind of market position in secondary ticketing that supports antitrust claims.***

For the past 12 years Live Nation has operated under a Consent Decree that among other things seeks to prevent anticompetitive leveraging of Live Nation promoted content to advantage Ticketmaster. Pursuant to the Amended Decree voluntarily entered in 2020, Live Nation's compliance is monitored by a former federal judge. ***There never has been and is not now any evidence of systemic violations of the Consent Decree. It remains against Live Nation policy to threaten venues that they won't get Live Nation shows if they do not use Ticketmaster, and Live Nation does not re-route content as retaliation for a lost ticketing deal.***

Ticketmaster is also the most transparent and fan-friendly ticketing system in the United States. ***Ticketmaster does not set or control ticket prices, strongly advocates for all-in pricing so that fans are not surprised by what tickets really cost, and is the undisputed market leader in ticket security and fighting bots. Ticketmaster also does not embrace deceptive and questionable secondary ticketing practices prevalent on rival sites such as speculative ticketing.***

> We are proud of the work we do across both concerts and ticketing, and will continue working to improve and support the live events industry.

62.    On February 23, 2023, *NPR* reported that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights called on the DOJ to continue to investigate the "anticompetitive conduct" of Live Nation and Ticketmaster, citing, *inter alia*, issues with Live Nation's pricing models and fees and alleged retaliatory behavior against artists and venues who work with alternative promoters or ticketing services. In a letter to Assistant Attorney General for Antitrust, Jonathan Kanter, Senator Amy Klobuchar wrote:

> As you know, we have long been concerned about the state of competition in America's ticketing industry, especially with the power and reach of Live Nation and its wholly-owned subsidiary, Ticketmaster. We strongly believe that music and live events connect communities and bring people together. For too long, Live Nation and Ticketmaster have wielded monopoly power anticompetitively, harming fans and artists alike.

> We recently held a bipartisan hearing in the Senate Judiciary Committee at which the President of Live Nation testified under oath, as did other industry participants, including an artist, a secondary market ticketing company, a promoter, and industry experts. We write to share some of the evidence developed at that hearing and to encourage the Division to follow up on some remaining questions in this industry.

> ***As an initial matter, other than Live Nation's executive, every witness at our hearing testified that Live Nation is harming America's music industry.*** For example:

> - The founder and CEO of Seat Geek testified that Ticketmaster now uses even longer exclusive agreements with venues, in some instances as long as ten years.

-23-

- Clyde Lawrence, lead Singer in the band Lawrence, testified that on a $30 ticket, Live Nation adds $12 in fees, and of that $42 price the customer pays, only $12 goes to the band before accounting for its cost of the tour.

- A competing promoter, Jam Productions, testified that Live Nation attempts to lock up talent so competitors cannot produce concert tours. He also noted that 87 percent of Billboard's Top 40 Tours in 2022 were ticketed by Ticketmaster in the U.S. and that Ticketmaster has exclusive ticketing contracts for more than 85 percent of the nation's NFL, NHL, and NBA teams. (While Live Nation contested the accuracy of this data, it failed to provide any alternative data.)

- A public policy expert at the James Madison Institute testified that Ticketmaster's market dominance allows it to harm consumers through charging service fees and demanding exclusivities. In particular, he noted that the service fees can be greater than 30 percent and "are tacked on at the very end of the process, on the very last screen before purchasing," raising questions about deceptive pricing strategies.

- A former DOJ lawyer testified that the conduct remedies in the 2010 consent decree from the Live Nation-Ticketmaster merger investigation have failed and that such failures constitute hard evidence of the firm's monopoly power. She also testified that "the company still has the power to silence market participants who fear its retaliation."

63.   On February 23, 2023, Live Nation issued the following statement:

If there's any chance of improving ticketing for fans and artists, we all need to focus on the facts. In the last few weeks alone, we've submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry. These include the fact that this industry is more competitive than ever: Ticketmaster has actually lost market share since the 2010 merger, not gained it; that venues set and keep most of the fees associated with tickets and are increasingly taking an ever-larger share; and

Ticketmaster has for years been advocating for a federal all-in pricing requirement. We believe that policymakers would benefit from asking more questions about the chaos caused by scalpers and the resale- first side of the industry. We remain committed to working with lawmakers on developing reforms that will benefit fans and artists including those outlined in a FAIR Ticketing Act.

64.    Also on February 23, 2023, the Company filed its annual report on Form 10-K (the "2022 10-K"), signed by Defendants Rapino, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Walden, and Watkins. Therein, the Individual Defendants misleadingly overstated the competition it faces in the live entertainment industry in an attempt to downplay its disproportionate market power:

**Competition**

Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences. . . .

\*      \*      \*

Some of our competitors in the live music industry have a stronger presence in certain markets, have access to other sports and entertainment venues and may have greater financial resources in those markets, which may enable them to gain a greater competitive advantage in relation to us.

***In markets where we own or operate a venue, we compete with other venues to serve artists likely to perform in that general region.*** Consequently, touring artists have various alternatives to our venues when scheduling tours. Our main competitors in venue management include ASM Global, Madison Square Garden Entertainment Corp., The Nederlander Organization and Bowery Presents, in addition to numerous smaller regional companies in North America, Europe, Australia and New Zealand. Some of our competitors in venue management may have more attractive or a greater number of venues in certain markets, and may have greater financial resources in those markets.

-25-

The ticketing services industry includes the sale of tickets primarily through online and mobile channels, but also through telephone and ticket outlets. The transition to online and mobile ticket purchases has made it easier for technology-based companies to offer primary ticketing services and standalone, automated ticketing systems that enable venues to perform their own ticketing services or utilize self-ticketing systems. In the online environment, we compete with other websites, online event sites and ticketing companies to provide event information, sell tickets and provide other online services such as fan clubs and artist websites.

We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events. Resale, or secondary, ticketing services have created more aggressive buying of primary tickets whereby certain brokers are using automated internet "bot" technology to attempt to buy the best tickets when they go on sale, notwithstanding federal and state prohibitions. We actively develop and apply methods to mitigate the impact of these bots, however, the bot technology constantly evolves and changes. The internet allows fans and other ticket resellers to reach a vastly larger audience through the aggregation of inventory on resale websites and marketplaces, and provides consumers with more convenient access to tickets for a larger number and greater variety of events.

We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

Our main competitors at the local market level for sponsorships and advertising dollars include local sports teams, which often offer state-of-the-art venues, strong brand association and attractive local media packages, as well as festivals, theme parks and other local events. On

the national level, our competitors include the major sports leagues that sell sponsorships combined with significant national media packages.

65.     With respect to the Taylor Swift incident, the 2022 10-K shifted responsibility onto hackers and "bots":

Although we have developed systems and processes that are designed to protect customer and employee information and to prevent security breaches or incidents (which could result in data loss or other harm or loss), such measures cannot provide absolute security or certainty. It is possible that advances in computer and hacker capabilities, new variants of malware, the development of new penetration methods and tools, inadvertent violations of company policies or procedures or other developments could result in a compromise of customer or employee information or a breach of the technology and security processes that are used to protect customer and employee information. The techniques used to obtain unauthorized access, automate or expedite transactions or other activities on our platform (e.g., "bots"), disable or degrade service or sabotage systems (or otherwise bring about one or more of these effects) may change frequently and as a result, may be difficult for our business to detect for long periods of time and may impact the efficacy of our defenses and/or the products and services we provide. In addition, despite our best efforts, we may be unaware of or unable to anticipate these techniques or implement adequate preventative measures. ***For instance, in November 2022, significant bot activity in connection with a large ticket onsale significantly contributed to a degraded website experience for customers and our eventually needing to pause the on-sale to address these issues.*** We have expended significant capital and other resources to protect against and remedy such potential security breaches, incidents and their consequences, including the establishment of a dedicated cybersecurity organization within our larger technology environment, and will continue to do so in the future.

66.     On this news, the price of Live Nation's stock declined 10.1% to close at $68.78 per share on February 24, 2023. An article published by *Barron's* on February 24, 2023 titled "Live Nation's Stock Is Paying for the Taylor Swift Ticket

Mess" observed:

> Live Nation Entertainment gave investors an upbeat earnings report and outlook but the stock on Friday was on track for its worst day in nearly a year. Worries about regulatory scrutiny and margins may be weighing on shares of the Ticketmaster parent.

67.     On July 27, 2023, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2023, which misleadingly stated:

> We are optimistic about the long-term potential of our Company and are focused on the key elements of our business model: expanding our concerts platform with more shows and fans in both existing and new markets as well as improving the on-site experience for our fans by enhancing food and beverage products and premium service offerings. We will drive conversion of ticket sales through development of innovative products that support selling tickets to fans. ***Our ticket marketplaces have reduced friction in the ticket purchase experience and created additional revenue opportunities.*** In addition, we continue to grow our sponsorship and advertising partnerships and our clients are able to reach their customers via the powerful connection that live shows creates with ardent fans.
>
> ***Serving artists remains at the center of our strategy and we work with them to continue improving the fan experience.*** We joined with more than 20 of the industry's top artist coalitions, management groups, music labels, and agencies to propose the FAIR Ticketing Act which focuses on reforms that will protect fans, artists, and venues. As part of this, we joined with President Biden to champion all-in pricing at the venues we operate and pushed for increased transparency to consumers, outlawing speculative tickets, greater enforcement of the BOTS Act and elimination of other deceptive practices. We believe these are positive first steps to a broader reform that is needed in the industry.

68.     On July 28, 2023, *Politico* reported that the DOJ "could file an antitrust lawsuit against [Live Nation and Ticketmaster] by the end of the year, according to three people with knowledge of the matter." According to the report, the DOJ

complaint was expected to allege that "the entertainment giant is abusing its power over the live music industry."

69.     On this news, the price of Live Nation's stock declined by 7.8% to close at $89.33 per share on July 28, 2023.

***Harm to the Company***

70.     As a direct and proximate result of the Individual Defendants' misconduct outlined herein, the Company has lost and expended, and will continue to lose and expend, millions of dollars.

71.     These costs include, *inter alia*: (i) legal fees in connection with the Securities Class Action, including attorneys', accountants', experts', and investigators' fees; (ii) potential fines in connection with the DOJ investigation and the Company's anticompetitive conduct; (iii) costs to implement measures to remedy the material weaknesses in Live Nation's internal controls; and (iv) substantial compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company.

72.     As a direct and proximate result of the Individual Defendants' misconduct and breach of fiduciary duties, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a liar's discount regarding Live Nation's stock in the future.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

73.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

74.     Live Nation is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

75.     Plaintiff is a current shareholder of Live Nation and was a continuous shareholder of the Company during the period of the Individual Defendants'

wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

76.     A pre-suit demand on the Board of Live Nation is futile and, therefore, excused. At the time this action was commenced, the eleven-member Board was comprised of Defendants Rapino, Maffei, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Mays, Paul, and Watkins. Accordingly, Plaintiff is only required to show that six Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all eleven of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

77.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

78.     The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants

breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

79.     As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Live Nation, the Individual Defendants knew, or should have known, the material facts surrounding the Company's anticompetitive conduct.

80.     Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

81.     Defendant Rapino is not disinterested or independent, and therefore, is incapable of considering a demand because he has been named as a defendant in the Securities Class Action, which is based on substantially similar allegations of wrongdoing arising from many of the same events based on the same facts as alleged in this action. Because Defendant Rapino faces massive class wide liability in the Securities Class Action, he cannot exercise disinterested and independent business judgment to consider a shareholder demand to initiate an investigation and litigation that may cause him to incur substantial liability in the Securities Class Action.

82.     Defendants Hinson, Fu, and Kahan are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, inter alia, public disclosure requirements.    Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or

inform the Board of the issuance of material misstatements and omissions regarding the Company's anticompetitive conduct and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Hinson, Fu, and Kahan cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

83.    Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Individual stock and stock options they held.

84.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Live Nation's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

85.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As all of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be

presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

86.    The acts complained of herein constitute violations of fiduciary duties owed by Live Nation's officers and directors, and these acts are incapable of ratification.

87.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Live Nation. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Live Nation, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

88.    If there is no directors' and officers' liability insurance, then the directors will not cause Live Nation to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

89.    Thus, for all of the reasons set forth above, all of the directors, and, if not all of them, certainly at least eight of them, cannot consider a demand with

disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

# COUNT I

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

90.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.   The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

92.   The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.   The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

94.   The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Live Nation were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii)

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

95.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Live Nation, their control over, and/or receipt and/or modification of Live Nation's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Live Nation, participated in the fraudulent scheme alleged herein.

96.    As a result of the foregoing, the market price of Live Nation common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Live Nation common stock in purchasing Live Nation common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

97.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including reputational harm.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

98.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

100.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

101.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

102.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

103.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## **COUNT III**

### **Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    By encouraging and accomplishing the illegal and improper

transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.   In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

106.   Plaintiff on behalf of Live Nation has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

107.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Live Nation.

109.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Live Nation that were tied to the performance or artificially inflated valuation of Live Nation, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

110.   Plaintiff, as a shareholder and a representative of Live Nation, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

111.   Plaintiff on behalf of Live Nation has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

112.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.   The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

114.   As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

115.   Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Gross Mismanagement

116.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.   The Individual Defendants, either directly or through aiding and abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation.

118.   As a direct and proximate result of the Individual Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

119.   Plaintiff on behalf of the Company has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and

transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.

Dated: November 10, 2023

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:   */s/ Rachele R. Byrd*
<u>      RACHELE R. BYRD</u>

BETSY C. MANIFOLD (182450)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra

-39-

Vincent A. Licata
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
gms@rl-legal.com
vl@rl-legal.com
sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

30155

## VERIFICATION OF MARK STEVEN ZWICK

I, Mark Steven Zwick, am the plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  As to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: 10/8/03

_____

MARK STEVEN ZWICK